FILED

DEC 2 3 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JIM B. DUNNIGAN,

                Plaintiff,

      v.

MICHAEL V. ASTRUE
Commissioner of Social Security,

                Defendant.

CV 07-1645-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

Before the court is Plaintiff's Amended Unopposed Motion For Attorney's fees pursuant to 42 U.S.C. § 406(b). The motion requires this court to interpret and apply the still-evolving standard for awarding attorney fees in Social Security cases under § 406(b). Based on the factors established by *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002), and explained in *Crawford v. Astrue*, ___ F.3d ___, 2009 WL 3617989 (9th Cir. Nov. 4, 2009) (en banc), the motion should be granted in part and fees

FINDINGS AND RECOMMENDATION     1

awarded in the amount of $11,874.00.

*Background*

A.    <u>The Disability Case.</u>

Dunnigan alleged disability based on a combination of impairments, including post-traumatic stress disorder ("PTSD"), depression, osteoarthritis, obesity, and skin disorders. On July 29, 2005, the Commissioner denied the Dunnigan's request for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-403 (2008). The Commissioner determined that the Dunnigan did not qualify as disabled at step three. (Tr. 53.) Dunnigan filed a request for reconsideration of the Commissioner's decision, which request the Commissioner denied on January 10, 2006. (Tr. 62.) On March 9, 2006, Dunnigan filed a request for hearing before an Administrative Law Judge ("ALJ") (tr. 70), who, after hearing, issued a decision on June 22, 2007, finding Dunnigan not disabled. (Tr. 6, 11-13.) Dunnigan sought rehearing of the ALJ's decision before the Appeals Council, but the Council denied his request on September 17, 2007. (Tr. 2.)

On November 1, 2007, Dunnigan filed this lawsuit seeking judicial review of the final decision denying his application for DIB. Important to the instant motion is that the parties agreed that the ALJ erred; they disagreed, however, over the proper remedy on remand. Also important is that their disagreement centered only on whether Dunnigan's condition satisfied a listing requirement. The Commissioner argued that the record did not require a finding of disability and that the matter should be remanded for further proceedings to allow the ALJ to reevaluate the testimony of the medical expert with regard to the Listings, the importance of the Veterans' Administration rating, and his findings at step five of the sequential evaluation process. Dunnigan contended that he met a listing requirement at step three and thus was disabled, and that the court

FINDINGS AND RECOMMENDATION    2

therefore should remand the matter for an award of benefits. The parties' dispute centered on the proper evaluation of Dr. Robert Davis's medical testimony and whether Dunnigan did in fact meet the listing requirement at step three under subsection (C)(2) of Listing 12.04. (Plaintiff's Opening Brief 8-10.) Dr. Davis testified that Dunnigan satisfied the "C" criteria of § 1204 if Dunnigan "was exposed to many people, surprises and changes, or additional stress." (Tr. 12).

Familiar to Social Security practitioners is the five-step process the Commissioner uses to determine whether individuals qualify as disabled under Title II of the Social Security Act ("SSA" or "Act"). 20 C.F.R. 404.1520(a)(1). Only step three of that process is relevant to the § 406(b) analysis because Dunnigan's argument here was that he was disabled under this step. At step three, if the claimant meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is found disabled, *see* 20 C.F.R. § 404.1520(a)(4)(iii), the Commissioner does not proceed to steps four and five, and the claimant is to receive benefits. Appendix 1 is entitled "Listing of Impairments" and contains fifteen general categories of conditions that constitute impairments, followed by criteria to determine whether a claimant's particular condition meets one or more of the listed impairments, thus rending the claimant "disabled" under the Act. 20 C.F.R. Pt. 404, Subpt. P, App.1.

Specifically relevant to Dunnigan's condition is § 12.00 of the Appendix, entitled "mental disorders" and which identifies the evidentiary sources, categories of mental conditions, and criteria relevant to determining whether a mental disorder renders a claimant "disabled" under the Act. Dunnigan's case turned on application of § 12.04, entitled "Affective Disorders", which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally

FINDINGS AND RECOMMENDATION    3

involves either depression or elation." Section 12.04 then describes the circumstances under which an affective disorder will constitute a "disability" under the Act, and in relevant part reads:

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> * * * *
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
>> 1. Repeated episodes of decompensation, each of extended duration; or
>>
>> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>>
>> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App.1.

On March 24, 2009, this court issued its Finding and Recommendations in which it concluded that the record required a finding of disability under Listing § 12.04 (C)(2). Specifically, this court found that

> In the context of the disability review process set forth by the SSA, the court concludes that the record mandates a finding of disability. Dr. Davis testified before the ALJ that [Dunnigan] satisfied subsection (C)(2) of Listing 12.04. The ALJ interpreted Dr. Davis's finding to mean that in an appropriately tailored work environment, Claimant was capable of performing job duties. This is, however, contrary to the framework set forth by the SSA. In that framework, the listings analysis occurs prior to and separate from the RFC and vocational analysis. The listings are addressed solely to the [Dunnigan's] medical condition and, by meeting or medically equaling a listing, a claimant is found disabled and is thus precluded from all employment. The context in which Dr. Davis made his statement renders its meaning clear and this conclusion is supported by the evidentiary record.

FINDINGS AND RECOMMENDATION    4

[Dunnigan] meets Listing 12.04 and is thus disabled and all subsequent sequential step analysis is rendered moot.

*Dunnigan v. Astrue*, CV 07-1645-AC, 2009 WL 1065070, at *9 (D. Or. Mar. 24, 2009). This court accordingly recommended that the Commissioner's motion to remand for further administrative proceedings be denied and that the Dunnigan's request to remand the case for an award of benefits be granted. The Commissioner did not filed objections to the Findings and Recommendations, and Dunnigan submitted no further briefing on the merits.

B.    The Fee Request.

On April 20, 2009, U.S. District Judge Michael Mosman adopted this court's Findings and Recommendation, and ordered this matter remanded for an award of benefits to Dunnigan. On June 3, 2009, Dunnigan's attorney submitted an application for Equal Access to Justice Award ("EAJA") attorney fees in the amount of $7,016.93, pursuant to 28 U.S.C. § 2412. The Commissioner did not object. On June 3, 2009, this court issued an Order awarding EAJA attorney fees in the full amount requested, $7,016.93.

On July 30, 2009, Dunnigan's attorney filed his unopposed motion for attorney fees under 42 U.S.C. § 406(b),[1] seeking $22,614.25 for his work performed in this case before this court.[2] Subsequently on that same day, Dunnigan's attorney filed the Amended Memorandum In Support

---

[1] In attorney fee motions under § 406(b), the real party in interest is the attorney, not the claimant. *Gisbrecht*, 535 U.S. at 798 n.6.

[2] In Social Security cases, attorney fees may be awarded under both the EAJA and § 406(b), but "an EAJA award offsets an award under Section 406(b)." *Gisbrecht*, 535 U.S. at 796. Congress enacted the EAJA in 1980 to permit recovery of attorney fees in those cases where "the Government's position in the litigation was not 'substantially justified.'" *Gisbrecht*, 535 U.S. at 796, citing 28 U.S.C. § 2412(d)(1)(A). EAJA fees are determined by the time spent and the attorney's hourly rate, which rate is statutorily capped $125.00. *Gisbrecht*, 535 U.S. at 796, citing 28 U.S.C. § 2412(d)(2)(A).

FINDINGS AND RECOMMENDATION    5

of Plaintiff's Motion for Attorney Fees ("Amended Pl's Memo in Support") which increased to $23,748.00 the amount of § 406(b) fees sought.

Dunnigan and his attorney entered into a contingent fee agreement in which Dunnigan agreed to pay his attorney the greater of twenty-five percent of any past-due benefits received or any EAJA attorney fee award obtained. (Tr. 58-59.)[3] Dunnigan's counsel seeks a fee of $23,748.00, which he represents to be twenty-five percent of his client's past-due benefit award, although counsel provided no precise figure of the amount of past-due benefits to be awarded. However, based on counsel's representation that the requested $23,748.00 fee is twenty-five percent of the past-due benefits Dunnigan will receive, the amount of past-due benefits to be awarded is $94,992.

Dunnigan's attorney supports his fee request by first establishing the reasonable hourly rate he proposes to apply to the work performed. Rather than begin with his normal hourly rate for non-contingent cases, however, counsel instead refers to the *Oregon State Bar 2007 Economic Survey* ("Survey"), used by the judges in this district as the "initial benchmark" for determining reasonable hourly rates applicable to attorney fee awards. *See* "Message From The Court Regarding Attorney Fee Petitions," available at www.ord.uscourts.gov/attorney_fee_statement. The Survey reports that attorneys practicing in "other areas" in Portland average $242 per hour.[4] *Oregon State Bar 2007 Economic Survey* at 31. Relying on the most recent Consumer Price Index-Urban (CPIU) data,

---

[3] Dunnigan's attorney subsequently filed his fee agreement separately, as an exhibit in support of the pending motion. *See* Dkt. No. 44.

[4] "Other" includes all legal practices excluding bankruptcy, business, civil litigation (insurance defense and personal injury), criminal, real estate/land use/environmental law, tax, general, and worker's compensation. *See* Survey at 29-31.

FINDINGS AND RECOMMENDATION    6

counsel adjusted this hourly rate to account for inflation, applying a multiplier of 1.01.[5] (Amended Plf's. Memo. in Support 3.) Applying the 1.01 multiplier to the $242 Survey hourly rate, the result is an adjusted average hourly rate for Portland attorneys of $244 and the basis rate for use in his further calculations. (Amended Plf's Memo. in Support 3.)

Counsel next identifies factors which he believes warrants an upward adjustment of this basic average hourly rate, all of which pertain to the risk of representing Social Security claimants. Specifically, he identifies two types of risk he asks this court to consider in determining the reasonableness of the fee sought. First, "[c]ases an attorney loses and for which the attorney never gets back at all," and second, cases in which the attorney is underpaid as the result of an EAJA award. (Plf's. Supplemental Memo. in Support 2.)

To account for these two categories of risk, Dunnigan's counsel employs several multipliers. First, he address the risk of not getting paid at all and starts his analysis with the Survey's statistic that "Portland attorneys spend 15% of their time on contingency matters, but derive 17% of their income from such matters."[6] He contends that this statistic requires use of a multiplier of 17/15 here. (Amended Pl's. Memo. in Support 3.) He states that because there is only a 36% chance of winning benefits for a claimant, a "contingency multiplier" of 2.78 (100/36) also should be applied to the $244.00 average hourly rate.[7] Applying both multipliers, counsel calculates at $768.76 per hour

---

[5] "In October of 2007, when the 2007 was mailed out to attorneys, the CPIU was 208.396, and the CPIU for the most recent month for which data is available, November 2008 is 212.425." Amended Plf's. Memo. in Support 3.

[6] Presumably counsel was referring to the 1998 Oregon State Bar survey where contingency matters were one subject of the survey because the 2007 Survey, upon which he relies, does not address contingency matters. *See Oregon State Bar 1998 Economic Survey* at 35.

[7] It is unclear to the court from what source counsel obtained his data to support the statistic that attorneys litigating Social Security claims have only a thirty-six percent chance of

($244.00 x 2.78 x 17/15.) the effective hourly rate for Portland attorneys practicing Social Security law in order to "properly compensate" them for the contingency risk of these cases. (Amended Pl's. Memo. in Support 3.)

To validate these multipliers, Dunnigan's attorney offers evidence of his total loss per contingency case to establish what he must make per year to account for his per-case loss. (Pl's. Supp. Memo. 3.) He provides "a rough estimate" of the average number of hours he spends on each Social Security case, estimating forty hours at the district court level and eighty hours for an appeal to the Ninth Circuit. (Pl's Supp. Memo. 2 n.2, 3.) He bases this estimate on his experience of having "written hundreds of Social Security briefs and the hours spent usually are between thirty hours and fifty five [sic] hours in total." (Pl's. Supp. Memo. 2 n.2.)

Dunnigan's counsel then calculates the amount he must make in each case "to break even" by multiplying the $244 reasonable hourly rate by the average 40 hours spent per case, totaling $9,760 per case. (Pl's. Supp. Memo 2.) He estimates that he has a 20% loss rate of the estimated forty Social Security cases he litigates per year. (Pl's. Supp. Memo. 2-3.) Multiplying the forty cases he takes per year by .2, he estimates his total annual loss at the district level to be $78,080. (Pl's. Supp. Memo. 3.) Counsel estimates that he appeals five of those losses to the Ninth Circuit, and loses four of them. (Pl's. Supp. Memo. 3.) From this, he calculates the total he must make per year in order to account for his loss before the Ninth Circuit to be $29,280.[8] Counsel estimates that

winning benefits for their claimants. Counsel states that the data is "based on statistics used in the Supreme Court appeal in *Gisbrecht*." (Amended Plf's. Memo. in Support 3 n. 3.) However, *Gisbrecht* contains no such data or reference, and counsel's brief contains no page cite to the *Gisbrecht* opinion on this point.

[8] Though counsel did not fully explain his methodology, it appears his calculation on this point is incorrect because he mistakenly subtracts $9,760 from his total to account for the one

FINDINGS AND RECOMMENDATION    8

the total amount he must make per year to account for cases where he never gets paid is $107,360

-- $29,280 at the Ninth Circuit level, plus $78,080 at the district court level. (Pl's. Supp. Memo. 3.)

The second category of risk are EAJA attorney fee awards, which Dunnigan' attorney

characterizes as a "loss" because those fee awards underpay him for his services. (Pl's Supp. Memo.

3.)   He calculates the total he must make per year to account for this underpayment by first

estimating the average EAJA hourly rate to be $175.00.  (Pl's Supp. Memo. 2.)  Multiplying the

reasonable hourly rate by forty, his average hours spent per case, he calculates at $2,760 "the loss

incurred by an attorney in a typical EAJA case." (Pl's Supp. Memo. 2.)  He then estimates that out

of the forty Social Security cases he takes per year, he is underpaid in twenty-nine of them.  Thus,

multiplying twenty-nine by the typical $2,760 EAJA fee "loss," he calculates his total loss per year

to equal $80,040.  (Pl's Supp. Memo. 3.)

Finally, Dunnigan's counsel estimates what he must make per case in §406(b) fees in order

to be fairly compensated, taking into account both the risk of not getting paid at all and the risk of

being underpaid with an EAJA award.  He estimates that he is successful in obtaining an EAJA

award in 80% of the cases he litigates.  Of those cases, he estimates that §406(b) fees are awarded

in 10% of them.  (Pl's. Supp. Memo. 3.)  He then multiplies 40, the total cases he takes per year, by

.08 (.8 x .1), to calculate the total cases per year where §406(b) are awarded, equaling 3.2.[9]  (Pl's.

Supp. Memo. 3.)  Counsel then divides $187,400, which represents the $80,040 annual loss from

EAJA underpayment plus the $107,360 annual loss from not getting paid at all, by a 3.2 multiplier

---

case he wins per year before the Ninth Circuit.  (Pl's. Supp. Memo. 3.)  This is in error, however,
because his calculation to determine his annual loss before the Ninth Circuit (4 x $9.760 =
$39,040) already excludes the one case he wins annually.

[9] Counsel provided no specific explanation for the 3.2 multiplier.

FINDINGS AND RECOMMENDATION    9

for a sum of $58,562.50, the total §406(b) fees per case he needs to make to put him 'on equal

footing [with] those attorneys of similar reputation and skill." (Pl's. Supp. Memo. 3.)  Ultimately,

he notes, the fee requested here, $23,748.00, equates to an hourly rate of $582.20 for the 40.79 hours

he worked on Dunnigan's court case.  (Pl's. Supp. Memo. 4.)

*Legal Standard*

A.    The Statute.

The basic standard is set by statute.  Attorney fee awards for Social Security cases are

governed by 42 U.S.C. § 406(b), which provides in relevant part:

> (b) Attorney fees
>
> (1)(A) Whenever a court renders a judgment favorable to a claimant under this
> subchapter who was represented before the court by an attorney, *the court may*
> *determine and allow as part of its judgment a reasonable fee for such representation,*
> *not in excess of 25 percent of the total of the past-due benefits to which the claimant*
> *is entitled* by reason of such judgment, and the Commissioner of Social Security may,
> notwithstanding the provisions of section 405(I) of this title, but subject to subsection
> (d) of this section, certify the amount of such fee for payment to such attorney out of,
> and not in addition to, the amount of such past-due benefits.  In case of any such
> judgment, no other fee may be payable or certified for payment for such
> representation except as provided in this paragraph.

(Italics supplied.)

B.    Controlling Cases.

Two cases control application of the § 406(b) standard.  In *Gisbrecht v. Barnhart*, the

Supreme Court undertook to clarify the statutory "reasonable fee" standard by taking on the question

of the "appropriate starting point" for judicial determinations of fee requests because of a "division

among the Circuits on the appropriate method of calculating fees under § 406(b)."  *Gisbrecht*, 535

U.S. at 792, 799.  The Court reversed fee awards made by district court judges who applied

FINDINGS AND RECOMMENDATION    10

"lodestar" methodology to evaluate and determine three fee requests under § 406(b)[10], and it held that § 406(b) did not displace or override contingent-fee agreements.  To the contrary, lower courts are to approach § 406(b) fee determinations by looking first to the contingent-fee agreement and then "testing it for reasonableness."  *Gisbrecht*, 535 U.S. at 808.

*Gisbrecht's* rationale is important context for evaluating the § 406(b) fee request in this case. Writing for the majority, Justice Ginsburg first observed that § 406(b)'s "reasonable fee" requirement could be measured by a lodestar calculation, but the statute's language did not exclude contingent-fee agreements. *Gisbrecht*, 535 U.S. at 799-800. To the contrary, contingent-fee contracts "are the most common fee arrangement between attorneys and Social Security claimants." *Id.* at 800. This fee arrangement is consistent with the circumstances existing in 1965 when Congress enacted the amendments that contained § 406(b), before the lodestar approach "gain[ed] a firm foothold [in] the mid-1970's". *Gisbrecht*, 535 U.S. at 801. This legislative history made it "unlikely" that Congress intended § 406(b) to incorporate "a lodestar method courts did not develop until some years later." *Gisbrecht*, 535 U.S. at 806.

The operation of § 406(b) also informed the proper test for determining a fee under its language.  Other fee award statutes shift to the loser the prevailing party's attorney fee, but § 406(b) fee awards instead "are payable from the successful party's recovery." *Gisbrecht*, 535 U.S. at 802. Reviewing § 406(b)'s language and rationale for enacting the provision as an amendment to the SSA, the Court concluded that Congress clearly intended to regulate the contingent-fee arrangements between practitioners and claimants to ensure that lawyers did not negotiate "inordinately large fees

---

[10] The *Gisbrecht* opinion decided three separate cases consolidated during appeals to the Ninth Circuit.

FINDINGS AND RECOMMENDATION    11

for representing claimants." *Gisbrecht*, 535 U.S. at 804. Hence, "Congress provided for 'a reasonable fee, not in excess of 25 percent of accrued benefits'[.]" *Id.* Congress also acknowledged, evidence that attorneys sometimes did not receive notice of their clients' benefits award nor, in fact, receive payment for their services. Consequently, with § 406(b) "Congress has thus sought to protect claimants against 'inordinately large fees' and also to ensure that attorneys representing successful claimants would not risk 'nonpayment of [appropriate] fees.'" *Gisbrecht*, at 805. The Court concluded by declaring "contingent-fee agreements as the primary means by which fees are set for successfully representing Social Security claimants in court," *id.* at 807, the Court

The Court then turned to the respective obligations of the court and the attorney in a § 406(b) fee request. First, the claimant's attorney "must show that the fee sought is reasonable for the services rendered." *Gisbrecht*, at 807. Important on this point is that a twenty-five percent contingent-fee award is not automatic or even presumed; "the statute does not create any presumption in favor of the agreed upon amount." *Id.* at 807 n.17. Second, the court is to review contingent-fee arrangements "as an independent check, to assure that they yield reasonable results in particular cases. *Id.* at 807. The statute requires "an affirmative judicial finding that the fee allowed is 'reasonable'". *Id.* (citation omitted).

Upon this foundation the Court established the factors lower courts are to consider in determining § 406(b) fee requests. To test the contingent-fee agreement for reasonableness, courts may reduce a fee based on "the character of the representation" and the "results the representative achieved." *Gisbrecht*, 535 U.S. at 808. Reduction also is proper if the attorney is responsible for delay in the court proceeding, because that delay, where a claimant is awarded benefits, would increase the period of time over which past-due benefits are awarded. *Id.* Such a reduction is

FINDINGS AND RECOMMENDATION    12

appropriate so that "the attorney will not profit from the accumulation of benefits during the pendency of the case in court." *Id.* Reduction also is appropriate where the "benefits are large in comparison to the amount of time counsel spent on the case" to avoid "windfalls" to attorneys. *Id.* Regarding this factor, the court may require a requesting attorney to submit a record of the hours spent on the case and a statement of the lawyer's "normal hourly billing charge for noncontingent-fee cases," as "an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement[.]" *Id.* In closing, the Court observed that application of these factors would necessarily depend on district court judges' familiarity "in a wide variety of contexts" with making reasonable determinations. *Id.*

In *Crawford v. Astrue*, ___ F.3d ___, 2009 WL 3617989 (9th Cir. Nov. 4, 2009) (en banc), the Ninth Circuit added its construction of *Gisbrecht* and § 406(b). There, the Ninth Circuit reviewed § 406(b) fee awards in three cases and determined that the district courts had not followed *Gisbrecht's* mandate. In each case the claimant and the attorney had entered into a contingent-fee agreement under which the attorney would be paid twenty-five percent of any past-due benefits awarded to the claimant. *Gisbrecht*, 2009 WL 3617989, at *1. In each case the attorney sought a fee less than twenty-five percent of the past-due benefit but the court awarded a fee "significantly lower" than the fee requested. *Id.*

The Ninth Circuit reversed the district court in each case because the judges had premised their fee analysis on the lodestar method rather than on the "'primacy of lawful attorney-client fee agreements.'" *Id.* at *6. Reiterating *Gisbrecht's* directive, the Ninth Circuit stated that the courts must assure the reasonableness of Social Security case fee awards by beginning with the fee agreement and then determining whether that amount should be reduced, not deciding, as the district

FINDINGS AND RECOMMENDATION    13

courts had done, "whether the lodestar amount should be enhanced." *Id.* The district courts'

approach "plainly failed to respect the 'primacy of lawful attorney-client fee agreements.'" *Id.*

(quoting *Gisbrecht*, 535 U.S. at 793).

The Ninth Circuit expanded on *Gisbrecht's* discussion of the unique character of § 406(b)

among fee statutes, noting primarily that "[l]odestar fees will generally be much less than contingent

fees because the lodestar method tends to under-compensate attorneys for the risk they undertook

in representing their clients and does not account for the fact that the statute limits attorneys' fees

to a percentage of past-due benefits and allows no recovery from future benefits, which may far

exceed the past-due benefits awarded." *Crawford*, 2009 WL 3617989, at *7. The court observed

that the district courts' lodestar-centered awards underscored the flaw of using that approach in §

406(b) determinations:

> In *Crawford,* for example, the district court awarded 6.68% of the past-due benefits.
> From the lodestar point of view, this was a premium of 40% over the lodestar.  It
> seems reasonable.  But from the contingent-fee point of view, 6.68% of past-due
> benefits was over 73% less than the contracted fee and over 60% less than the
> discounted fee the attorney requested.  Had the district court started with the
> contingent-fee agreement, ending with a 6.68% fee would be a striking reduction
> from the parties' fee agreement. This difference underscores the practical importance
> of starting with the contingent-fee agreement and not just viewing it as an
> enhancement.

*Crawford*, 2009 WL 3617989, at *7 (footnote omitted).

The Ninth Circuit then reinforced the factors identified in *Gisbrecht* which lower courts

should use to determine whether a reduction from the contingent-fee amount is appropriate:

1.  the character of the representation, specifically, whether the representation was
    substandard;

2.  the results the representative achieved;

3.  any delay attributable to the attorney seeking the fee; and

FINDINGS AND RECOMMENDATION    14

4. whether the benefits obtained were "not in proportion to the time spent on the case" so that the attorney does not receive a "windfall".

*Crawford*, 2009 WL 3617989, at *7. To assess the last factor, it is proper for lower courts to request or examine the requesting attorney's record of hours spent and a statement of the attorney's normal hourly rate, and to "consider the lodestar calculation, but *only as an aid* in assessing the reasonableness of the fee." *Id.* (italics in original).

Importantly, the Ninth Circuit noted that *Gisbrecht* "did not provide a definitive list of factors that should be considered in determining whether a fee is reasonable or how those factors should be weighed[.]" *Crawford*, 2009 WL 3617989, at *7. Indeed, the Ninth Circuit added to the *Gisbrecht* factors by implicitly acknowledging that complexity and risk also are factors to be considered in determining a § 406(b) fee award: determining whether the attorney has met the burden to show that the requested fee is reasonable must be "based on the facts of the particular case. . . . the district court should look at the complexity and risk involved in the specific case at issue to determined how much risk the firm assumed in taking the case." *Id.* at *9. In so observing, the court rejected as "misconstruing the nature of the risk assessment" an approach "focusing on the firm's overall success rate instead of the specific facts that make a given case more or less risky for the firm. *Id.*[11]

Finally, although the district courts have discretion to determine a reasonable fee under § 406(b), they must provide an explanation of the reasons for a fee award, specifically, how the award relates

---

[11] Further evidence that risk is a factor to be considered by the courts is the Ninth Circuit's observations that the lodestar method "tends to under-compensate attorneys for the risk they undertook in representing their client and does not account for the fact that the statute limits attorneys' fees to a percentage of past-due benefits and allows no recovery from future benefits," and that the attorneys in the appealed cases "assumed significant risk in accepting these cases, including the risk that no benefits would be awarded or that there would be a long court or administrative delay in resolving the cases." *Id.* at *7, *8.

FINDINGS AND RECOMMENDATION    15

to the circumstances of the particular case. *Id.* at *8.

## Discussion

*Gisbrecht* provided the lower courts with no precise guidance for determining the reasonableness of fee requests under § 406(b). Justice Scalia observed in his *Gisbrecht* dissent: "I do not know what the judges of our district courts and courts of appeals are to make of today's opinion. . . . [I]t does nothing whatever to subject these fees to anything approximating a uniform rule of law." *Gisbrecht*, 535 U.S. at 809. His dissent also was prophetic: since *Gisbrecht*, the courts of appeal and the district courts have attempted to apply its standard but have produced no consensus on the method by which to determine reasonableness under § 406(b). *See Ellick v. Barnhart*, 445 F. Supp. 2d 1166 (C.D. Cal. 2006) (discussing extensive survey of "decisions applying *Gisbrecht* to section 406(b) fee requests" and concluding that the methods by which courts determine the reasonableness of § 406(b) attorney fees are not uniform). The *Ellick* court found forty-three reported decisions, and determined that in twenty-three of those decisions, plaintiffs requested and were awarded the full twenty-five percent allowed under the SSA statute. *Ellick*, 445 F. Supp. 2d at 1168-69. In eight other decisions, the courts awarded the plaintiffs the full amount requested but less than twenty-five percent of the past-due benefits. *Id.* 1170-71. In the remaining twelve cases, the plaintiffs requested twenty-five percent but the courts reduced the amount. *Id.* at 1171-72. In her majority opinion for the en banc court in *Crawford*, Judge Fletcher, noted that "*Gisbrecht* did not provide a definitive list of factors that should be considered in determining whether a fee is reasonable or how those factors should be weighed[.]" *Crawford*, 2009 WL 3617989, at *7.

*Crawford* improved upon *Gisbrecht's* standard by acknowledging that lower courts

should consider risk when determining the appropriate amount of § 406(b) attorney fees, but *Crawford* did not provide trial court judges with clearer guidance for determining the reasonableness of these fee requests. *Crawford's* dissenting opinions support this reading. Judge Clifton, after disagreeing with the majority's decision to simply award the fees requested rather than to remand that determination to the trial courts in each case, found the *Crawford* majority opinion "provides no serious explanation of why these awards are reasonable[.]." *Crawford*, 2009 WL 3617989, at *9 (Clifton, J., concurring in part and dissenting in part). Judge Bea's dissenting opinion observed that the lower-court judges followed *Gisbrecht* and that the *Crawford* majority did not, and he stated that the lower-court judges adhered to *Gisbrecht's* mandate by considering the amount of time each attorney worked on their respective case. *Crawford*, 2009 WL 3617989, at *10-11 (Bea, J., dissenting). He described the *Crawford* majority reasoning as "inadequate" for justifying reversal of the lower court decisions. *Crawford*, 2009 WL 3617989, at *11-12 (Bea, J., dissenting).

Thus, in the wake of *Gisbrecht* and *Crawford*, ambiguity remains as to the precise standard for assessing reasonableness, including the weight a court may give the lodestar factors, when evaluating a request for § 406(b) attorney fees. *See, e.g., Crawford*, 2009 WL 3617989, at *5, *7 (discussing the proper application of lodestar factors in determining reasonableness after *Gisbrecht* and stating that they may be used "*only as an aid*") (emphasis in original). However, *Gisbrecht* and *Crawford* make clear that the § 406(b) analysis always begins with the contingent-fee agreement, and then proceeds with an evaluation of the agreement's reasonableness and an assessment of whether any reduction is appropriate by applying the factors identified in *Gisbrecht* to the circumstances of the specific case. To those factors the trial courts in the Ninth

FINDINGS AND RECOMMENDATION     17

Circuit must add risk, as *Crawford* establishes; specifically, the risk to the requesting attorney of having taken the specific case under review. *Crawford*, 2009 WL 3617989, at *9.[12]  With this general guidance, the court turns to the specific fee request here.

A.     The Fee Agreement.

The first step in the *Gisbrecht* analysis is to look to the contingency agreement and determine whether it is within the twenty-five percent statutory boundary.  A contingent-fee agreement exists between Dunnigan and his attorney, by which they agreed the attorney fee for work in federal court would be the greater of:  (1) twenty-five percent of any past-due benefits received, or (2) any EAJA attorney fee award obtained.  The terms of the contingency-fee agreement are within the statutory limits.

The next step is to confirm that the fee sought does not exceed § 406(b)'s twenty-five percent ceiling, which determination requires evidence of total past-due benefits to be paid.  Here, Dunnigan's attorney did not provide definitive evidence of the past due-benefits to be awarded.  However, he has represented in his supporting brief that the fee amount sought is twenty-five percent of the past-due benefits to which Dunnigan is entitled as of the time of filing the attorney fee motion.  If the fee sought, $23,748.00, represents twenty-five percent of the past-due benefits to be awarded to Dunnigan, then the total past-due benefits would amount to $94,992.00.  Although evidence of the precise amount or an estimate supported by the record of the past-due benefit is the better method of establishing this element of the attorney's § 406(b)

---

[12] The court emphasized focusing the § 406(b) analysis on the particular case: "'Rather . . . a court's primary focus should be on the reasonableness of the contingency agreement in the context of the particular case.'" *Crawford*, 2009 WL 3617989, at *5 n. 7 (quoting *Wells v. Sullivan*, 907 F.2d 367, 371 (2d Cir. 1990)).

burden, the record in this case supports accepting Dunnigan's attorney's representation as adequate for conducting its reasonableness assessment.

B.    The Reasonableness of the Fee Sought.

Having determined that the contingent-fee percentage specified in agreement is within the statutorily mandated ceiling and that the fee sought does not exceed that ceiling, the court turns to its primary inquiry, the reasonableness of the fee sought.  Dunnigan's attorney seeks $23,748.00 for his work in this case before this court.  Applying the *Gisbrecht* factors, as interpreted by *Crawford*, the court finds that Dunnigan's attorney has not demonstrated that a twenty-five percent fee is reasonable on the record this case.

1.    The requesting attorney's burden.

*Gisbrecht* established that the attorney seeking a § 406(b) fee must demonstrate the reasonableness of the fee sought, but the briefing Dunnigan's attorney filed in support of his fee request does not specifically address each of the *Gisbrecht* factors for determining reasonableness.  The briefing does not address *Crawford's* effect on the application of the *Gisbrecht* factors.  Dunnigan's attorney's only treatment of *Crawford* was to file a "Notice" with the court on November 4, 2009, conveying without comment a copy of the *en banc* opinion.

The briefing that Dunnigan's attorney did offer to support his fee request provides only limited assistance to the court's reasonableness analysis.  First, it primarily focuses on a lodestar approach by constructing a proposed reasonable hourly rate and then advocating for an enhancement of that rate.  Although *Gisbrecht* states and *Crawford* reinforces that the court may consider a lodestar calculation as an aid to its reasonableness assessment, Dunnigan's attorney premises his fee request on a lodestar analysis.  These contravenes *Gisbrecht's* and *Crawford's*

FINDINGS AND RECOMMENDATION    19

directives to begin with the fee agreement and then test it for reasonableness by applying the *Gisbrecht* factors to the specific case, ultimately deciding whether a downward adjustment is appropriate.

Second, the risk analysis focuses on the wrong risk factor. *Crawford* directed that the risk factor to be considered is that of taking "the specific case at issue" and not of "the firm's overall success rate" in Social Security cases, and noted that an approach that turns on the firm's overall success rate instead of the specific facts of the case "misconstru[es] the nature of the risk assessment." Dunnigan's attorney's analysis takes the very approach to risk analysis that *Crawford* rejected.

Third, the risk analysis formula offered to support the requested hourly rate enhancement is indecipherable and not supported by the cited authority, or other authority. Dunnigan's attorney cites to the Oregon State Bar 2007 Economic Survey ("Survey") in support of his calculations that Portland attorneys spend fifteen percent of their time on, and derive seventeen percent of their income from, contingency matters. (Amended Pl's Memo. in Support 2-3.) However, the Survey does not address eontingency cases at all. He also attributes to the *Gisbrecht* opinion statistical data that only "a 36% chance of winning benefits" exists for a Social Security claimant. (Amended Pl's Memo. in Support 3 & n.3.) However, no such data appears in the *Gisbrecht* opinion.

In sum, the supporting briefing only partially informs the court's application of the *Gisbrecht* factors to the fee request in this case. These shortfalls do not preclude a reasonableness analysis, however. The briefing submitted to support the fee request, together with the record of the case, contains sufficient information relevant to the *Gisbrecht* factors to

enable the court to perform its role here.

2.       The character of the representation.

*Gisbrecht* stated that reduction of a twenty-five percent contingency fee is appropriate if the character of the representation is substandard. *Gisbrecht*, 535 U.S. at 808. On this point the Supreme Court cited *Lewis v. Secretary of Health and Human Servs.*, 707 F.2d 246 (6th Cir. 1983), where, because of the poor quality of legal representation, the Sixth Circuit vacated and remanded a lower court's twenty-five percent attorney fee award. *Id*. at 250-51. In *Lewis*, the substandard representation consisted of counsel's poor preparation for hearings, his failure to meet briefing deadlines, his submission of court documents void of legal citations, and over-billing his client. *Id.* at 248-50. The court also stated that "[r]outine approval of the statutory maximum allowable fee should be avoided in all cases. In a great majority of the cases, perhaps, a reasonable fee will be much less than the statutory maximum." *Id.* at 250.

Dunnigan's attorney's representation was not substandard. Rather, it demonstrated competency in and familiarity with the subject matter, consistent with counsel's representation of years of experience representing Social Security claimants and his expertise in this area of law. His briefing on the merits was useful to the court, was of good quality, and focused on the issue key to Dunnigan's claim for benefits, whether or not Dunnigan's condition satisfied the criteria of a listing. Counsel's references to the administrative record were accurate, relevant, and helpful, and he cited to appropriate legal authority to support his arguments. Because, under *Gisbrecht*, reduction may be taken only for substandard performance, no reduction here is warranted under this factor.

3.    The results the representative achieved.

Dunnigan's attorney won benefits for his client. This court ordered remand for an award of benefits, the remedy Dunnigan's attorney sought. In so ordering, this court rejected the Commissioner's argument that remand should be for further proceedings instead.

The circumstances of the case in which the result is achieved, however, are important to the court's assessment of this factor. The inquiry focuses on whether counsel's efforts made a "meaningful and material contribution towards the result achieved." *Lind v. Astrue*, No. SACV 03-01499 AN, 2009 WL 499070, at *4 (C.D. Cal. 2009). The Commissioner agreed with Dunnigan that the ALJ had erred and also agreed that the case should be remanded. Thus, Dunnigan's attorney faced a less daunting challenge here than he would have if the Commissioner had vigorously defended the ALJ's decision or argued to uphold the ALJ's decision because the errors could not be reversed under the controlling standard of review.

In addition, the scope of the parties' dispute was limited to a single issue, whether or not Dunnigan's condition met the requirements of a listing. On that point, the administrative record contained clear and unequivocal medical testimony, not discredited by the ALJ, that Dunnigan's depressive disorder met the criteria of Listing 12.04(C)(2). The record demonstrated with equal clarity that the ALJ erred by misapplying the five-step framework in evaluating this testimony.

Moreover, the Commissioner filed no objections to this court's Findings and Recommendation that Dunnigan's request to remand the case for an award of benefits should be granted. The District Judge thereafter adopted this court's recommendation and ordered that benefits be awarded to Dunnigan. Thus, Dunnigan's attorney was not required to defend this court's recommendation against objections from the Commissioner or convince the District

FINDINGS AND RECOMMENDATION    22

Judge to uphold this court's ruling.

While the result achieved here, an order for an award of benefits, is very favorable for Dunnigan, that outcome cannot be viewed in isolation nor can it be presumed always to require a fee award of the full twenty-five percent.  If obtaining benefits always supported awarding fees for the full twenty-five percent, it would make irrelevant the other *Gisbrecht* factors and render perfunctory the trial courts' assigned task of "making reasonableness determinations in a wide variety of contexts[.]"  *Gisbrecht*, 535 U.S. at 808.  Nothing in *Gisbrecht* – or *Crawford* – supports such a conclusion; rather, as the Sixth Circuit observed, "[r]outine approval of the statutory maximum allowable fee should be avoided in all cases.  In a great majority of the cases, perhaps, a reasonable fee will be much less than the statutory maximum."  *Lewis v. Secretary of Health and Human Servs.*, 707 F.2d at 250.[13]

The instant case falls within the *Lewis* court's admonition.  The favorable result Dunnigan's attorney obtained for his client supports his fee request but does not compel a full award of twenty-five percent.  The Commissioner eased Dunnigan's attorney's task by conceding the ALJ's errors and agreeing to remand.  On the merits of the single issue advanced by Dunnigan's attorney, the administrative record well revealed the ALJ's analytical error.  The circumstances here support a reduction from the twenty-five percent maximum.

    4.     Attorney responsible for any delay.

It is evident from the record that this factor does not warrant a reduction in the fee Dunnigan's attorney seeks.  The Supreme Court stated that a reduction of a requested fee is

---

[13] *Gisbrecht* cited *Lewis* with approval when explaining the bases for the factors used to determine the reasonableness of a § 406(b) fee request.  *See Gisbrecht*, 535 U.S. at 808.

appropriate under under § 406(b) if the requesting attorney inappropriately caused delay in the proceedings, so that the attorney "will not profit from the accumulation of benefits" while the case is pending. *Gisbrecht*, 535 U.S. at 808 (citing *Rodriquez v. Bowen*, 865 F.2d 739, 746-47 (6th Cir. 1989)). Here, Dunnigan's attorney filed two unopposed motions for extensions, one of forty-five days to submit his opening brief and another of fourteen days to file his response to the Commissioner's motion to remand. No evidence in the record suggests that either request was intended, even in part, to delay the proceedings in this case. Accordingly, reduction under this factor is not warranted.

5.    Whether the benefits are large in comparison to the time spent on the case.

Dunnigan's attorney represented that he spent a total of 40.79 hours on his client's court case. The starting point for determining whether the benefits to be awarded are large in comparison to the time counsel spent on Dunnigan's case is counsel's characterization of the time he invests in the typical Social Security case he handles. In his supporting briefing for the instant motion, he states:

> 40 hours per case is used as a rough estimate of what it takes this attorney to present a social security case to the Court. The undersigned has written hundreds of social security briefs and the hours spent usually are between thirty hours and fifty five hours in total. There are exceptions.

Supplemental Memorandum in Support of 406(b) Attorney Fees 2 n.2 ("Supplemental Memorandum"). In this case, Dunnigan's attorney spent an amount of time that is almost the exact amount of time he spends on most of his cases.

That the amount of time Dunnigan's attorney spent on this case equals the time he invests on most of his cases is instructive for the court's comparison of the time spent to the benefits obtained. *Gisbrecht* approved lower courts' use of time records in evaluating this factor. 535

FINDINGS AND RECOMMENDATION    24

U.S. at 808.  Here, Dunnigan's attorney represented that he invested an amount of time on this case equal to the time he spends on most of his cases, but he requests the highest fee permitted under the statute.  It is reasonable to conclude, consistent with the Sixth Circuit's view that full fee awards should be the exception, that an average expenditure of time should not as a matter of routine translate to an award of the statutory maximum contingent fee, but instead suggests a more moderate attorney fee as the appropriate compensation.

Next in the court's comparison is to review the tasks Dunnigan's attorney performed that comprise the basis for the 40.79 hours spent.  Dunnigan's attorney did not provide an itemized time record or even a summary of his time spent on the case, but instead simply represented in his supporting brief that he spent 40.79 hours on his client's court case.  Thus, the fee request here is immediately dissimilar in significant ways from those considered *Crawford*.  There, the plaintiffs' attorneys each submitted an itemized fee petition and other materials to aid the courts' determination of whether the benefits were large in comparison to the time spent on the case.  Here, by contrast, Dunnigan's attorney requests the full twenty-five percent of the past-due benefits but submits no itemized statement or other evidence to meet his burden of demonstrating that his request is reasonable.

The lack of detail for the time spent precludes a thorough comparison of the time spent to the benefits won for the client, but the case's docket provides insight into the work comprising counsel's effort and, thus, allows an adequate basis for assessing the reasonableness of the hours spent.  Dunnigan's attorney filed three main documents in this case:  the complaint (a two-page document that followed standard format for Social Security complaints in federal court), his opening brief (fifteen pages in length), and his response to the Commissioner's motion to remand

(which response comprised three pages). In addition, the record contains the 597-page administrative transcript (a length in the average range), the Commissioner's four-page answer, and the Commissioner's one-page remand motion accompanied by his ten-page supporting memo, all of which Dunnigan's attorney read, as evidenced by his briefing. The opening brief counsel submitted on the merits contains a significant amount of standard content for a Social Security plaintiff's brief: a short statement of jurisdiction, the appropriate standard of review, a description of the sequential five-step process, and a summary of the relevant regulation (here, Listing 12.04). The opening brief also includes case-specific content: Dunnigan's medical history is outlined by date in bullet-point style, counsel summarizes the hearing testimony in two pages and the ALJ's decision in a single paragraph, and the argument that Dunnigan's conditions met the listing's criteria – by far, the single longest section of the opening brief – wove law and fact with workman-like skill. The three-page response demonstrated a similar workman-like effort.

Review of these filings as well as the transcript and other entries in the record compels the conclusion that this case was not remarkable and was instead typical or average, as counsel's representation of the amount of hours spent would suggest, thus reinforcing the assessment that nothing commends a fee outside the average range. Therefore, that the hours spent are average and the work performed consistent with an average case supports reduction from the twenty-five percent maximum here.

6. The risk presented by the case.

*Crawford* clarified that risk is an appropriate factor to consider in determining a § 406(b) award. The opinion also made clear that the individual case must be the focus of the risk

analysis: "the district court should look at the complexity and risk involved in the specific case at issue to determining how much risk the firms assuming in taking the case." *Crawford*, 2009 WL 3617989, at *9. Looking at a particular firm's "overall success rate" is the wrong approach to assessing risk. *Id*.

In his supporting briefing, Dunnigan's attorney quantifies risk using the approach that *Crawford* expressly rejected. His analysis centers on the risk of non-payment and underpayment in contingent cases generally (Pl's Supp. Memo. 2), and he devotes much of his discussion to constructing the hourly fee needed in successful cases to compensate him for these risks. Dunnigan's attorney, however, did not discuss "the specific facts that make a given case more or less risky for the firm," *Crawford*, 2009 WL 3617989, at *9, or in any way tie his risk analysis to the particulars of Dunnigan's case.

Turning then to the particular circumstances of this case, the court concludes that neither the factual nor legal issues were particularly complex. The parties agreed that remand should be ordered but disputed for what purpose remand should be made. Their dispute centered on whether or not Dunnigan's condition met a listing requirement at step three under Title II, and whether a condition meets a listing requirement is a common issue in Social Security cases. On that issue, Dr. Davis had testified at hearing that Dunnigan in fact met the requirement, and both parties ultimately agreed that the ALJ incorrectly evaluated Dr. Davis's testimony. Dunnigan's medical conditions involved anxiety and substance abuse disorders that, while serious, are not medically complex ailments. The length of the record supports this conclusion; for a Social Security case, it is of average length. Counsel's medical summary also supports this conclusion, as it comprised only two pages of his opening brief. (Pl's Opening Brief 2-4.) And, Dunnigan's

opening brief totaled only fifteen pages and his reply just three pages, underscoring the relative absence of complex or unusual factual and legal complexity in the case.

In sum, the record of this case discloses no basis to conclude that Dunnigan's situation presented unique, unusual, complex, or extensive facts or legal issues. Rather, at the conclusion of the administrative process, Dunnigan's circumstances presented a case involving commonly encountered issues and a typical factual record that did not involve technical, complicated, or obscure medical issues. Accordingly, the court concludes that this case presented a risk no greater than average to the attorney considering it for possible appeal to the district court. Thus, reduction from the twenty-five percent maximum is warranted under this factor.

C.      The Fee Award In This Case.

Dunnigan's attorney seeks a fee of $23,748.00, an amount he says represents twenty-five percent of a past-due benefits award that his client will receive. Applying the *Gisbrecht* factors and guided by the Ninth Circuit's *Crawford* discussion of those factors, the court has determined that reductions are appropriate under three of the six factors it must consider: the results achieved, the benefits obtained compared to the time spent, and the risk presented by the case. Fully explained above, the court's reasons for reducing the fee from the full twenty-five percent distill to the average nature of the case's facts and legal issues, coupled with a fee request supported by arguments and analysis that do not squarely address the *Gisbrecht* factors and which do not conform to *Crawford's* directives.

In this case, the court concludes that Dunnigan's attorney's § 406(b) fee request should be reduced to fifty percent of the total requested. This percentage accounts for reduction under the factors discussed above and counsel's failure to support his fee request consistent with

FINDINGS AND RECOMMENDATION    28

*Crawford's* directives, but also includes accounts for counsel's experience and expertise in this area of law, considerations that mitigate the reduction here. On that latter element, this court agrees with Judge Bea's observation that the courts should avoid fee awards that "punish successful attorneys and reward incompetent attorneys" (*Crawford*, 2009 WL 3617989, at *14 n.4) (Bea, J., dissenting), a result obtained when courts award lower § 406(b) fees to experienced attorneys who spend less time on a Social Security case because they are more experienced and efficient in handling them. The record here supports a fee award that takes into account Dunnigan's attorney's experience in this area, which undoubtably contributed to the result he obtained for his client.[14] Applying the reduction to the $23,748.00 requested fee results in a § 406(b) fee award of $11,874.00.

 *Crawford* expressly recognized that "[a]s evidence of the reasonableness of the resulting fee," the court may consider as an aid counsel's billing records and lodestar calculations. *Crawford*, 2009 WL 3617989, at *7. A comparison of the § 406(b) fee the court has determined should be awarded here to a lodestar assessment is an appropriate method of gauging the reasonableness of that fee award. As an initial observation, it is Dunnigan's attorney's burden to demonstrate the reasonableness of his fee request, but he did not specifically address the *Gisbrecht* factors or *Crawford's* application of them, did not provide detailed billing records, and did not provide his regular hourly rate because he represented that he takes all his cases on a contingent-fee arrangement. Instead, he provided only the total number of hours he spent on the

---

 [14] Dunnigan's attorney has practiced Social Security law for fourteen years, has co-authored the two most recent Oregon State Bar CLE publications on Social Security law, and is co-founder of the Oregon Social Security Claimants Organization. (Amended Pl.'s Memo in Support 2 n.1.)

FINDINGS AND RECOMMENDATION    29

case and supported the effective hourly rate, $582.20, that his proposed fee award would produce with a series of calculations not based on this specific case and which lack supporting authority. These shortcomings impair counsel's effort to meet that burden, but there is enough information in the record, coupled with counsel's supporting briefing, to aid the court's comparison on this point.[15]

The court's fee award here results in an effective hourly rate of $291.10, a per-hour rate almost twenty percent higher than the $244.00 hourly rate for Portland private-practice attorneys in the "other" category, which rate Dunnigan's attorney offered as the base hourly rate for his calculations. (Amended Pl's Memo in Support 2-3.) In fact, this effective hourly rate places Dunnigan's attorney comfortably above both the average and median of hourly billing rates of Portland attorneys in the "other" category, at approximately the 66th percentile, and well above both the average and median of hourly billing rates of Portland attorneys in private practice with comparable years of experience, at approximately the 70th percentile. *See Oregon State Bar 2007 Economic Survey* at 28, 31. Under a traditional lodestar approach, the effective hourly rate resulting from the court's award here is squarely within the reasonable range.

Furthermore, the amount of the fee represents twelve and one-half percent of the past-due benefits to be awarded to Dunnigan, a percentage comparable to the percentages the *Crawford* court implicitly approved based on significantly more detailed supporting information. *See Crawford*, 2009 WL 3617989, at *1-3, *8 (observing that the fees sought and approved by the

---

[15] The court emphasizes that § 406(b) fee requests should conform to the requirements of *Gisbrecht* and *Crawford*. The court's willingness to undertake the fee analysis here, notwithstanding that counsel did not fully support his request in accordance with those cases, is not license for practitioners to bypass that analysis in future § 406(b) fee requests.

majority were "not excessively large in relation to the benefits achieved"). Finally, the fee awarded also avoids a "windfall" to Dunnigan's attorney, a potential outcome of which courts should be mindful and should strive to avoid. *See Gisbrecht*, 535 U.S. at 808 (quoting *Wells v. Sullivan*, 907 F.2d 367, 372 (1990)).[16] In sum, testing the court's fee award against an appropriate hourly rate and lodestar factors confirms that the court's reduction and resulting fee award are reasonable on the record of this case.

*Conclusion*

Plaintiff's Amended Unopposed Motion for Attorney Fees Pursuant to 42 U.S.C. § 406(b) should be GRANTED in part and a § 406(b) fee of $11,874.00 should be awarded to Dunnigan's attorney.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due January 6, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 23rd day of December, 2009.

JOHN V. ACOSTA
United States Magistrate Judge

---

[16] The hourly rate Dunnigan's attorney proposes, $582.20, far exceeds the highest hourly rate based on years of experience reflected in the Survey, $461.00, for private practitioners in Portland, which rate is at the 95th percentile. *See Oregon State Bar 2007 Economic Survey* at 28. Counsel's proposed rate also exceeds *any* hourly rate at the 95th percentile, whether based on years of experience or area of practice. *See Oregon State Bar 2007 Economic Survey* at 28-31.